COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-05-379-CR

 

 

ROY ALVIN ADAMS                                                             APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

           FROM
THE 396TH DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

I.  Introduction

Appellant Roy Alvin Adams was
charged with intoxication manslaughter with a deadly weapon.  After Adams pleaded not guilty, a jury found
him guilty and assessed his punishment at 12 2 years=
confinement. 








In his first two issues Adams
claims the evidence is legally and factually insufficient to sustain the
verdict.  In his next three issues Adams
asserts that the trial court erred by failing to suppress the blood alcohol
test, by denying his requested jury instruction under Article 38.23, and by
overruling his objection that the prosecutor=s cross-examination was shifting the burden of proof.  In his sixth, seventh, and eighth issues
Adams argues that the trial court improperly made a deadly weapon finding and
erred by overruling his objection to retrograde extrapolation testimony and by
not holding a hearing on his amended motion for a new trial.  In his final two issues Adams contends that
the State violated his right to due process by failing to disclose exculpatory
evidence and that the trial court erred by overruling his objection to the
repeated playing of the videotape in violation of Texas Rule of Evidence
403.  We affirm. 

II.  Background

A. The Traffic Stop

It was June 12, 2004, when
Officer Darren Medlin notified dispatch that he was making a traffic stop.  Officer Medlin stopped Angela Youngblood for
speeding ninety-two miles per hour near Highway 121=s southbound Cheek-Sparger exit and parked safely behind her
Mustang.  The patrol car=s rear deck lights were active. 
Traffic was light and weather-wise, the night included intermittent
sprinkling.








B. Omar Hinojosa 

While Officer Medlin worked
the traffic stop, Omar Hinojosa, a truck driver, was driving home from
work.  Having driven his eighteen-wheeler
to Houston that day, he had dropped it off and was now in the middle of Highway
121 south.  Before reaching the
Cheek-Sparger exit, Hinojosa noticed police lights ahead, off the shoulder,
where someone had been pulled over. 
Within seconds, Hinojosa also realized that a car was traveling in front
of him in the far right lane.  Although
they were still approximately a quarter to a half-mile away from the stopped
cars, Hinojosa worried that the other car seemed too close to the officer=s vehicle.  Familiar with
traffic laws, Hinojosa knew that cars approaching an emergency vehicle should
either move away or slow down, but the other car did neither.  Hinojosa moved to the inside lane, yielding
space to the other car to move away from the outside lane.  Hinojosa witnessed the car collide with the
parked Mustang and saw no indication that the car causing the collision had
braked beforehand.








Hinojosa called 911 and
immediately stopped.  While trying to
calm the woman who had been stopped by the officer, he noticed the officer
lying in the road.  He had no contact with
the driver of the vehicle that struck the Mustang. Hinojosa testified that the
vehicle that struck the Mustang was not speeding or weaving.  He said it appeared that somehow the driver
just lost control of the vehicle.  An
unidentified passerby checked the officer for vital signs, apparently finding
none.

C. Officer Darren Medlin

Officer Medlin, the victim in
this case, had been serving the Grapevine Police Department since 2000
primarily as a DWI patrol officer; he was also tactical unit sniper.  He and his wife, Gina, lived near Grapevine
and had two little girls.

Grapevine=s traffic division focuses on traffic enforcement, accident
investigation and reconstruction, and DWI detection; in 2004, two officers held
the nighttime positions.  One was Officer
Mark Shimmick; the other was Officer Medlin.

On Friday, June 11, 2004,
Officer Medlin spent the day testifying at a trial.  After leaving the Tarrant County courthouse
in the afternoon, Officer Medlin went home to sleep and then began his shift at
11:00 that night.  He and Officer
Shimmick met with their supervisor, then headed out on patrol.

D. Roy Adams








Adams lived with his mother
in Bedford.  On Friday, Adams woke at
6:45 a.m. and went to work at 8:00.  He
left work at 5:00 to wash his new car, then visited Sam=s Club to browse.  Adams went
alone to a topless bar called the Dallas Gentlemen=s Club, arriving at 7:30 p.m. 
Adams drank Crown Royal shots and claimed to have left the club at 11:30
p.m.  After a gas station stop, he went
to another club.  However, Adams=s ATM receipts place him at the gas station at 1:00, suggesting that
he remained at the topless bar longer than he claimed.  At the second club, Adams ordered another
Crown Royal and left at 2:00 a.m.

Heading home on Highway 121,
Adams sought the Cheek-Sparger exit. 
Adams said that he was not feeling any adverse effects from alcohol or
lack of sleep, but he admitted having some fatigue from dancing.  Adams said he saw the exit, but saw nothing
more until he observed the deployed passenger-side air bag, broken windshield,
and his car sliding to a stop down the exit ramp. When his car came to a stop,
he got out and saw headlights behind him. 
He looked at his car and then called 911.  Next, he called his mother.

Adams withdrew significant
sums of cash on the day of the crash.  A
lunchtime withdrawal netted $80.  Later
at 8:35 p.m., he obtained $100 from the strip club=s ATM.  Two hours later, Adams
withdrew $60 more from the same ATM. 
Shortly before 1:00 a.m., Adams extracted another $60 while at a Race
Trac gas station in north Dallas.  Adams
had $45 with him after the crash, indicating he spent $255 cash during the day
and night of the accident.

 

 








III.  Sufficiency of the Evidence

In his first two issues,
Adams asserts that the evidence to sustain the verdict against him is both
factually and legally insufficient.  We
disagree.  

A.  Standards of Review

In reviewing the legal
sufficiency of the evidence to support a conviction, we view all the evidence
in the light most favorable to the verdict in order to determine whether any
rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt.  Jackson v.
Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Hampton v.
State, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).








This standard gives full play
to the responsibility of the trier of fact to resolve conflicts in the
testimony, to weigh the evidence, and to draw reasonable inferences from basic
facts to ultimate facts.  Jackson,
443 U.S. at 319, 99 S. Ct. at 2789.  The
trier of fact is the sole judge of the weight and credibility of the
evidence.  See Tex. Code Crim. Proc. Ann. art. 38.04
(Vernon 1979); Margraves v. State, 34 S.W.3d 912, 919 (Tex. Crim. App.
2000).  Thus, when performing a legal
sufficiency review, we may not re-evaluate the weight and credibility of the
evidence and substitute our judgment for that of the fact finder.  Dewberry v. State, 4 S.W.3d 735, 740
(Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the
evidence in favor of the verdict.  Curry
v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

The sufficiency of the
evidence should be measured by the elements of the offense as defined by the
hypothetically correct jury charge for the case.  Malik v. State, 953 S.W.2d 234, 240
(Tex. Crim. App. 1997); Ortiz v. State, 993 S.W.2d 892, 895 (Tex. App.CFort Worth 1999, no pet.).  Such
a charge would be one that accurately sets out the law, is authorized by the
indictment, does not unnecessarily restrict the State=s theories of liability, and adequately describes the particular
offense for which the defendant was tried. 
Gollihar v. State, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001); Malik,
953 S.W.2d at 240.  The law as
authorized by the indictment means the statutory elements of the charged
offense as modified by the charging instrument. 
See Curry, 30 S.W.3d at 404.








When reviewing the factual
sufficiency of the evidence to support a conviction, we view all the evidence
in a neutral light, favoring neither party. 
Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); Drichas
v. State, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005).  We then ask whether the evidence supporting
the conviction, although legally sufficient, is nevertheless so weak that the
fact-finder=s
determination is clearly wrong and manifestly unjust or whether conflicting
evidence so greatly outweighs the evidence supporting the conviction that the
fact-finder=s
determination is manifestly unjust.  Watson,
204 S.W.3d at 414B15, 417 ; Johnson
v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).  To reverse under the second ground, we must
determine, with some objective basis in the record, that the great weight and
preponderance of all the evidence, though legally sufficient, contradicts the
verdict.  Watson, 204 S.W.3d at
417.








In determining whether the evidence
is factually insufficient to support a conviction that is nevertheless
supported by legally sufficient evidence, it is not enough that this court Aharbor a subjective level of reasonable doubt to overturn [the]
conviction.@  Id. 
We cannot conclude that a conviction is clearly wrong or manifestly
unjust simply because we would have decided differently than the jury or
because we disagree with the jury=s resolution of a conflict in the evidence.  Id. 
We may not simply substitute our judgment for the fact-finder=s.  Johnson, 23 S.W.3d at
12; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  Unless the record clearly reveals that a
different result is appropriate, we must defer to the jury=s determination of the weight to be given contradictory testimonial
evidence because resolution of the conflict Aoften turns on an evaluation of credibility and demeanor, and those
jurors were in attendance when the testimony was delivered.@  Johnson, 23 S.W.3d at
8.  Thus, we must give due deference to
the fact-finder=s
determinations, Aparticularly
those determinations concerning the weight and credibility of the evidence.@  Id. at 9.

An opinion addressing factual
sufficiency must include a discussion of the most important and relevant
evidence that supports the appellant=s complaint on appeal.  Sims
v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).  Moreover, an opinion reversing and remanding
on factual insufficiency grounds must detail all the evidence and clearly state
why the finding in question is factually insufficient and under which
ground.  Goodman v. State, 66
S.W.3d 283, 287 (Tex. Crim. App. 2001); Johnson, 23 S.W.3d at 7.

B. The Evidence 

1. Post-crash
Investigation








At 2:32 a.m., dispatch sent
Euless Officer Deana Ramsour to investigate a possible major collision
involving an officer on Highway 121.  She
arrived as Officer Edgar Hurtado was trying to stop the traffic that still
flowed through the scene.  Officer
Hurtado advised Officer Ramsour that the suspect vehicle was further down the
road and waved her south toward that area. 
Adams=s 2004
Lincoln was 500 feet from the accident location and stopped in the center of
the freeway exit.  Its lights were still
on, and it had major damage to the right front quarter panel, right front tire,
and windshield.  Embedded in the
windshield were hair, blood, scalp debris, and a piece of Officer Medlin=s uniform. Inoperable, the car=s right front tire was back under the front passenger=s floorboard area.

Adams sat across the exit
ramp on the road=s shoulder,
talking on his cell phone.  When Officer
Ramsour pulled up, Adams started to head across the roadway to her and stepped
in front of traffic flowing through the area. 
Officer Ramsour yelled for Adams to stop, a car passed, and, after
checking for other traffic, she told Adams to come over to her.








Officer Ramsour first
determined that the Lincoln was Adams=s and that he had been driving. 
Adams quickly inquired, ADid I hit someone, did I hit someone?@  Apologizing, he surmised that
he had run into a parked car.  Adams also
explained that he must have dozed off, and he repeatedly asked whether he had
hit someone.  Adams also indicated that
he had been at a friend=s
house.  As they spoke, Officer Ramsour
noticed a very strong, distinct alcohol odor coming from Adams=s breath and body.  His eyes
were very red, bloodshot, watery, dilated, heavy, and glassy, and his speech
was slightly slurred.  Observing these
signs of intoxication, Officer Ramsour asked a question about drinking.  Adams conceded that he had been drinking
earlier and repeated his dozing off contention. 
Officer Ramsour asked Adams to sit in her car for safety=s sake until the traffic could be stopped.  She specified that he was not under arrest,
but that he was being detained so she could talk with him about what had
happened.

Uncuffed, Adams willingly sat
in the back of the vehicle.  When the
officer left him in the car, the air was running Afull blast@ and she had
opened the rear hatch to access traffic cones and flares.  While in the car, Adams started yelling and
screaming; he said that he could not breathe. 
Hearing his cries, Officer Ramsour returned to her car to find Adams
breathing normally.  Officer Ramsour
asked him to calm down so she could continue to secure the scene.  Meanwhile, Sergeant Williamson contacted
Officer Ramsour by radio to assist her. 
Officer Ramsour told the sergeant that Adams might be intoxicated, but
she had not done any field sobriety tests yet.








Officer Ramsour identified
the videotape from her police vehicle, which showed her arrival at the scene up
to the point of making contact with Adams. 
She said the in-car video automatically activates when the emergency
lights are turned on.  However, her video
shut off after she exited the vehicle. 
Officer Ramsour explained that she hit the stop button prior to exiting
the vehicle, which she always does when she responds to a major incident.  She said if it had been a DWI stop she would
not have turned off the video.  Officer
Ramsour said she knew that if she had left her video on the jury would be able
to hear and see Adams as she initially approached him and engaged in the
conversation she testified about.  She
said turning the video off was not police policy, it is just something she
does.

Sergeant Williamson drove
down to the area near Adams=s car.  Officer Ramsour informed
him of her observations and Adams=s statements.  The sergeant then
took over the investigation of Adams. 
Retrieving Adams from Officer Ramsour=s SUV, the sergeant noticed a moderate to strong smell of alcohol
wafting from Adams.  Sergeant Williamson
interviewed Adams, learning that, this time, Adams contended that he had merely
consumed one or two drinks.  Adams
refused to do any field sobriety tests. 
Adams did not appear to be totally coherent, and he had bloodshot,
glassy eyes.

Based upon the physical
evidence and the discussions amongst the officers, Adams was arrested.  Sergeant Williamson believed that Adams=s intoxication had caused the death of Officer Medlin.  At the police station, the sergeant conducted
a DWI interview, read Adams the appropriate warnings, obtained Adams=s blood-test refusal, and transported Adams to Harris Methodist HEB
Hospital for a mandatory blood draw. 
Sergeant Williamson observed the nurse draw the blood.  Williamson testified that he took Adams to
the police department and put the blood sample into a secure refrigerator.








Tracy Langley, the nurse who
drew the blood, testified that Adams was very afraid and kept repeating Aoh my God.@ She said
she never smelled the odor of alcohol on Adams. 
She could not tell if he was intoxicated.  She said if he was intoxicated she would
remember that.

2. Accident
Reconstruction

Back at the crime scene,
Euless Detective Scott Peterson arrived.[2]  He walked through the area, first turning to
Officer Medlin=s undamaged
car.  He found the rear flashing lights
on, the radio still working, a speed locked into the radar, and the in-car
video camera recording.  Down the road
past crash debris, the detective came upon the Mustang and observed obvious
damage to the back left quarter panel area. 
Next, the detective stepped over to the tarp that covered his fallen
comrade=s body.  Later, he walked to
where Adams=s vehicle
had stopped.  The C.R.A.S.H. team arrived
and began to photograph, collect, and analyze the evidence and also to
forensically map the scene.  Officers
reopened the freeway at about 8:45 a.m.








Officer Medlin wore his navy
blue uniform, girded with body armor made of Kevlar.  The Kevlar did not protect him from the blunt
force trauma he suffered.  Detective
Peterson deduced that Adams=s vehicle struck Officer Medlin=s right side.  Without any
braking, the Lincoln hurtled straight into Officer Medlin at highway
speed.  The officer=s head hit the car=s steel roof structure above the windshield, wedging it back several
inches.

The accident reconstruction
efforts exposed no evidence of pre-impact braking.  After colliding with the officer and the
Mustang, Adams=s Lincoln
scraped its metal undercarriage and ground to a halt on the inverted
front-wheel several hundred feet from the collision site.  Significantly, the detective concluded that
the Lincoln could not have gone straight down the exit rampCas it didCunless
someone was steering.  In other words, if
no one had steered, the damaged vehicle would not have slid straight down the
ramp.[3]









Detective Peterson reviewed
all of the evidence collected, all of the videotapes from the police cars, all
of the photos, and all of the radio traffic and 911 tapes from that night.  In light of that evidence, he concluded that
Adams was intoxicated and that his intoxication caused the collision that
killed Officer Medlin.  Detective
Peterson further believed that Adams was reckless in controlling his vehicle,
maintaining a proper lookout, and driving onto the shoulder of the road on the
night he hit Officer Medlin. 
Contributing factors included alcohol, fatigue, and failure to maintain
a single lane.  But for Adams=s driving that night, he stated that Officer Medlin would still be
alive.

3. Medical Examiner=s Evidence








Dr. Nizam Peerwani, the
Tarrant County Medical Examiner, testified regarding the results of the autopsy
performed on the body of Officer Medlin. Injuries to Officer Medlin=s skull and neck were capable of causing his death. Blunt force trauma
to the right side of his head, behind the right ear, was the most significant
injury.  This wound consisted of a deep,
gaping laceration with an underlying depressed, compound skull fracture and
massive brain trauma and resulted in the officer=s death.  This fatal injury was
caused by motor vehicle contact and was consistent with the officer=s head colliding with the roof structure of the Lincoln, leaving the
steel indented.  Officer Medlin suffered
multiple skeletal fractures including the right arm bone, the compound fracture
of his left leg, the right shin bone, and a compound fracture of the collar
bone.  The two leg fractures occurred
approximately nine inches above the heels and are typical of an upright
pedestrian-vehicle collision.  Officer
Medlin=s body also suffered multiple rib fractures that correlate to the
major trauma his body suffered when it landed at an angle.  Dr. Peerwani concluded that the cause of
Officer Medlin=s death was
blunt force injuries due to a motor vehicle-pedestrian collision.  He concluded the official manner of death was
homicide.          4. Deadly Weapon Finding 

Officer Shimmick stated that
a motor vehicle constitutes a deadly weapon. 
Both Detective Peterson and Dr. Peerwani concurred with this
characterization.

5. Adams=s Intoxication

a. Direct Evidence of
Impairment

Evidence of Adams=s smell, appearance, and speech indicated intoxication.  Witnesses at the scene testified that a very
strong and distinct odor of alcohol wafted from both his breath and his
body.  They also testified that Adams=s eyes were very red, bloodshot, watery, dilated, heavy, and
glassy.  His speech was slightly slurred.

Sergeant Williamson confirmed
that on his video Adams said that he had drunk two to three hours earlier, not
that he had drunk a lot earlier or had been drinking all day and that he had
dozed off.  Officer Ramsour testified
that going to a smoky night club can cause red, bloodshot, watery eyes, and
that allergies also can cause this. 
Sergeant Williamson also testified that bloodshot eyes can be caused by
any number of things and that the odor of alcohol, by itself, is not a sign of
intoxication.  He also said that being
involved in an accident can cause someone to become disheveled and
anguished.  








Besides his outward
appearance suggesting intoxication, Adams admitted to Officer Ramsour he had
been drinking Aa whole lot
earlier, but that he had stopped a couple of hours ago.@  Adams later denied drinking on the
night of the offense while being treated by another doctor a few weeks after
the crash.  Months after the offense, Adams told his neurologist that he drank
four shots of alcohol between 7:00 p.m. and midnight, then one more shot
between midnight and 2:00 a.m.

Furthermore, running into a
parked car, stepping into traffic, and being unaware of whether you had hit
someone can point to intoxication.  There
was testimony that intoxicated drivers have trouble staying on the road and
judging distances.  The Lincoln traveled
900 feet after impact.  Detective
Peterson advised the jury than an unimpaired driver could have stopped more
quickly. Also, Adams=s refusal to
perform field sobriety tests when asked suggested that he was trying to hide
his insobriety.  Adams also refused to
perform tests on videotape and to submit to a blood test. 

b. Scientific/Expert
Testimony Regarding Impairment








Proof of intoxication also
came from Adams=s blood
sample, which revealed his .11 blood alcohol concentration (BAC).  Two experts from the Tarrant County Medical
Examiner=s (ME=s) office
interpreted these results, informing the jury that a BAC of .11 impacts on a
person=s reaction time and his or her ability to perceive things in front of
him or her.  At that level, a person=s judgment is impaired. 
However, someone with an alcohol tolerance could still appear sober to
the casual observer, but be incapable of complicated tasks.  Moreover, a .11 BAC proves impairment for the
purposes of driving, both under the per se statutory standard and because they
would not have the normal use of their mental and physical faculties. 

Beryl Landry, a forensic
toxicologist at the ME=s office,
testified that she received a blood sample on June 14, 2004 that purported to
come from Adams.  The sample was twice
tested using gas chromatography and indicated a .1170 and .1188 BAC.  Landry admitted that the lab was not
accredited in June 2004 when this test was performed.  She also admitted that there had been
malfunctions with the gas chromatograph in the past.  Landry testified she had no idea what the BAC
of Adams was on June 12 at 2:30 a.m., the time of the accident.








Angela Springfield, chief
toxicologist for the ME=s office,
testified concerning her review of the testing records in this case.  She said the test was run in accordance with
office protocol.  Springfield said the
lab was accredited in June 2005 and was not required to be certified before
then.  The ME=s office is now
accredited and received the accreditation in June 2005 by the American Society
of Crime Laboratory Directors/ Laboratory Accreditation Board (ASCLD/LAB).[4]  Prior to this accreditation, the lab was
subjected to proficiency testing by the College of American Pathologists.  Landry testified that they were evaluated
four times a year and there were no problems. 
Springfield also said that the proficiency
testing results prior to certification were satisfactory.








Dr. Maurice Dennis, an expert
on how alcohol affects a person=s ability to drive, concluded that complex reaction time is affected
at a .05 BAC.  He supported this
assertion by contending that, not only his research, but also that of the AMA
and many others, shows that all individuals are intoxicated when their BAC
reaches .05.  His own research revealed
that each participant lost the normal use of their mental and physical
faculties at a .04 BAC.  He further
testified that alcohol impairs the ability to drive for several reasons.  Driving is a divided-attention activity, and
driver vigilance is actually affected at a level of .025 BAC.  People brake when they perceive the need,
and, since alcohol impairs the ability to perceive, Adams=s failure to brake
before the collision was consistent with his being intoxicated.  Also, a
prominent British study indicated that the likelihood of sleepiness increased
at a .06 BAC. In general, Dr. Dennis explained that the higher the
blood-alcohol level, the greater the risk of a fatal crash.  Dr. Dennis reviewed information regarding
this crash and opined that both intoxication and drowsiness were contributing
factors.

6. Videotape 

Grant Fredericks of Avid
Technology testified that he enhanced the various police videos from the scene
of the accident.  The videos were then
played numerous times for the jury. 
Fredericks testified that when a police officer comes to a scene where
he thinks there may be evidence to obtain he should leave his recorder on.  He also said that at the time of impact
Officer Medlin=s heel may
have been touching the white line that separates the shoulder of the roadway
from the rest of the road.

C. Adams=s Defense 

1. In General 

Adams ultimately relied on an
epilepsy defense at trial.  The evidence
at trial showed that the connection between alcohol and seizures is very
complicated, and both alcohol consumption and alcohol withdrawal can induce
seizures.








Some evidence revealed that
Adams may have fallen asleep.  Adams
specifically told Officer Ramsour that he must have dozed off while driving.  But since alcohol is a depressant and makes
people sleepy, Adams=s admission
that he dozed off also indicated that he was possibly intoxicated.  However, when Adams testified, he claimed
that alcohol did not make him sleepy. 
Adams=s prescription for Zyrtec-D was in his car
and warned of drowsiness when combined with alcohol.  Dr. Dennis
opined that alcohol tends to exacerbate sleepiness and that drinking enough
alcohol can make you pass out.  Dr.
Dennis agreed that Adams=s falling
asleep could have caused this crash.

Some evidence did not
directly support the State=s contention that Adams was either intoxicated or drowsy due to
intoxication.  Adams had not been
speeding or weaving and traveled at the posted speed limit.  Post-collision, Adams telephoned 911 and
recited his phone number and location. 
According to DWI Officer Shimmick, Adams=s speech during the call did not sound slurred.

Contrary to the State=s evidence of intoxication, at trial Adams discussed conditions such
as nightclub smoke and allergies, which can cause eye irritation symptoms.  Other defense evidence described people being
disoriented or uncooperative after experiencing a car wreck.

Adams also suggested that
Officer Medlin stood in an unsafe place. 
Officer Medlin=s fatigue
from a long day in court, supposedly causing him to disregard safety
procedures, was another defense proposition. 
When Adams testified, however, he agreed that Officer Medlin bore no
fault for this crash.   








2. The Epilepsy Defense

At twenty-seven, Adams had no
medical history of seizures.  Weeks after
the crash, Adams did have a seizure.  At
trial, Adams contended that he did not remember the crash, did not fall asleep,
and must have suffered a seizure.

Jurors learned of two
generalized tonic-clonic (GTC) seizures. 
On June 29, 2004, Adams sought an allergy treatment and, while in the
waiting room, suffered a GTC seizure after just having filled out a form that
indicated no seizure history.  Adams
convulsed, became rigid, and lost consciousness; paramedics were called.  Kay Alexander, a nurse, and Sally Hernandez,
a medical assistant at the ear, nose, and throat clinic in Bedford, both
testified that they observed Adams have a seizure and lose consciousness.  Alexander testified that Adams had a grand
mal seizure.  Dr. Charles Railsback from
the Texas Ear Nose and Throat Specialists Clinic testified that he is familiar
with epileptic seizures.  He testified
that he saw Adams at the clinic and that he was unconscious, stiff, making
jerking motions, and had in fact, had a grand mal seizure.

Referred in July to Dr.
Robert Leroy, a neurologist specializing in epilepsy, Adams described no prior
seizures, but reported involuntary jerks in his arms and legs and episodes
where he would Azone out.@  Dr. Leroy believed that these
episodes were possibly partial seizures.








Adams submitted to
around-the-clock video EEG long-term monitoring at a Dallas hospital for
several days the following September. 
During the monitoring, active steps were taken to allow a seizure to
occur; sleep deprivation on the third day caused Adams to seize.

a. Dr. Leroy=s Assessments

Dr. Leroy testified that he
performed a complete evaluation of Adams after he was referred to him following
his seizure at the ENT Clinic.  He did
various testing and determined that Adams had a seizure disorder. 

The jury observed an
audio-visual presentation of his GTC seizure, simultaneously showing his brain
waves.  Thus, Adams presented evidence
regarding two witnessed seizures: one when seeking allergy relief and one at the
Dallas hospital.  Additional testimony
disclosed a seizure over the Thanksgiving holiday in 2004.  Dr. Leroy
opined that Adams was prone to having seizures and probably has primary
generalized epilepsy.  The doctor
concluded that Adams=s condition
was highly suggestive of a genetic type of epilepsy, rather than one brought
about by injury or stroke, and he diagnosed Adams with juvenile absence
epilepsy syndrome.













Having considered the
evidence from Adams=s criminal
case, Dr. Leroy concluded that it is reasonably medically probable that Adams
suffered an absence seizure at 2:30 in the morning on June 11, 2004, causing
the crash that killed Officer Medlin.[5]  According to Dr. Leroy, such a seizure was
consistent with the facts because absence seizures can precede a GTC episode,
have an abrupt onset, no aura, be brief in duration, and involve a prompt
recovery without a postictal indication. 
When a person has an absence seizure, he would not be awakened by a loud
noise.  If a person was sleeping and was
in an accident, the loud noise would wake him up.  Post-seizure recovery period
characteristics rule out a GTC seizure on the night of the offense because those
seizures result in a lengthy recovery period of up to hours of confusion,
sleep, strong headaches, and impairment. 
Each of Adams=s GTC seizures resulted in lengthy periods
of unconsciousness: at first he was described as being Aout of it@ and, after the
second induced seizure, his postictal phase included thirty minutes of
unconsciousness.  Dr. Leroy agreed that
it was very unlikely that Adams suffered a GTC seizure on the night of the
offense; post-seizure conditions would prevent operation of a vehicle or a cell
phone.  He
recognized that the incidence of absence seizures in males after the age of
fourteen is uncommon, but that minor seizure activity can occur without someone
recognizing it. 

Dr. Leroy=s diagnosis relied on the medical history Adams related to him.  Dr. Leroy candidly conceded the subjective
nature of medical histories, that circumstances such as Adams=s could give rise to misinformation in a history, and that Adams=s various post-crash medical histories were replete with
conflicts.  For example, two days after
the crash, Adams told a physician that he had not experienced any loss of
consciousness during the crash.  When
later treated for the first GTC seizure, Adams told the ER physician that he
had experienced a Aloss of consciousness@ episode that night.  In that
June 29, 2004 history, Adams denied that drinking or sleepiness played any part
in the crash; he also denied experiencing any seizures in the past.  Adams testified that he only denied
sleepiness when discussing the wreck later at the ER.  A few weeks
later, Adams told Dr. Leroy that he drank four shots on June 11 between 7:00
p.m. and midnight, then one more shot between midnight and 2:00 a.m., but had
not felt sleepy or intoxicated.








Dr. Leroy also admitted that
any seizure that purportedly led to the crash could have been itself induced by
alcohol consumption.  Dr. Leroy viewed a
video of Adams at the scene and saw no signs of intoxication.  He saw no signs of neurological or
physiological impairment, which he would expect to see if Adams was
intoxicated.  Other seizure-induction
factors included stress, such as the emotional fallout from the crash, which
could have induced the GTC seizure in the doctor=s office.  Also, an
antidepressant, Lexapro, prescribed for Adams post-crash, carries a risk of
seizure.  Another factorCalcohol withdrawalCcan cause seizures, especially if drinking ceases abruptly as occurred
with Adams=s post-crash
experience.  Thus, experiencing the
stress of facing criminal charges and prison for having killed an officer,
existing sleep problems and sleep deprivation, taking Lexapro, and experiencing
alcohol withdrawalCall combinedCcould have led to Adams=s first GTC seizure.

Dr. Leroy acknowledged the
possibility of nonepileptic causes for the crash.  He admitted that it could have been caused by
Adams=s falling asleep (he is a chronic insomniac) or his intoxication.  Dr. Leroy recognized the complexity of the
association between alcohol usage and epilepsy. 
Alcohol withdrawal can cause and induce seizures that are not
epileptic.  Dr. Leroy concluded his
testimony by agreeing that it would be tragic for someone who actually
committed a crime to incorrectly rely on epilepsy as a defense to that crime.

b. Dr. Hernandez 








As a rebuttal witness the
State called Dr. Angel Hernandez, a neurologist who directs several Cook
Children=s Medical Center programs.  Dr.
Hernandez reviewed most of Adams=s medical records and some of the offense records. Relying on
objective information only, this doctor believed that Adams suffers from GTC
seizures such as the one purposefully induced in the Dallas hospital.

However, Dr. Hernandez
discounted the conclusion that an absence seizure caused the crash because,
although absence seizures are characterized by an arresting activity and are
short in duration, they involve multiple daily occurrences.  Absence seizures are not isolated, happening
once and then ceasing; they repeat. 
Also, absence seizures are common in children and adolescents, but are rarely
seen in patients more then twenty years= old.  Dr. Hernandez saw no
objective indication that Adams suffered from absence seizures in Adams=s medical records.

Dr. Hernandez=s review of Dr. Leroy=s records indicated that the records contradicted Dr. Leroy=s trial testimony.  The
Trileptal medication that Dr. Leroy prescribed Adams exacerbated absence
seizures; it is not prescribed when absence seizures are diagnosed because
other medications are available.  Dr.
Hernandez emphasized nothing in the defense expert=s records indicated that Dr. Leroy found that Adams suffered from
absence seizures.  Dr. Hernandez opined
that, contrary to Dr. Leroy=s testimony, Adams did not suffer an absence seizure on the night of
the offense.

 








c. Adams=s Testimony

Adams began his testimony by
telling the jury that he did not cause Officer Medlin=s death by reason of any type of intoxication or falling asleep. The
day=s chronology included waking at 6:45 a.m., going to work at 8:00,
leaving work at 5:00 for a car wash, eating at McDonald=s, browsing through Sam=s Club, enjoying the Dallas Gentleman=s Club, snacking at a Race Trac gas station, dancing at Carson=s, and driving home.

Food included a light
breakfast at the office and snack food. 
He ate a McDonald=s burger,
fries, and salad.  While he did not eat
at either club, Adams picked up a honey bun while at Race Trac early in the
morning.

Drink-wise, Adams testified
to drinking four shots of Crown Royal beginning at 7:30 p.m. and a couple of
five-dollar bottles of water.  At the
second club, Adams said he only had a few sips of whiskey.

Adams spent quite a bit of
money that night.  To counter the
suggestion that it all went to alcohol, Adams described paying for lap dances
and drinks and tips for dancers, too. 
Also, a car wash cost twenty dollars.








Leaving the second club at
closing time, Adams stated that he would not have driven if he had been
intoxicated.  Driving home on Highway
121, Adams planned to use the Cheek-Sparger exit.  Adams averred that this exit sign was his
last observation until he saw his passenger-side air bag deployed, his broken
windshield, and his car sliding to a stop down the exit ramp.  Adams claimed that at the time of the crash
he was not feeling any effects from alcohol, nor was he sleepy.  Adams admitted that his body was fatigued
from dancing. When his car stopped, he got out and saw headlights behind
him.  After looking at his car, he called
911, then called his mother.

Regarding his subsequent
contact with the officers, Adams disputed that he had stepped out in front of a
passing car and also said he never claimed that he had a lot to drink that
night.  While agreeing that he was not
mistreated by officers that night, Adams suggested that he refused field
sobriety testing because he feared the officers would just say that a young,
black male had failed them.  Although he
acknowledged the recorded statements about dozing off, Adams chalked these
assertions up to his trying to rationalize what had occurred.  Finally, Adams contended that he refused the
blood test out of fright.  Regardless of
any other excuses conveyed, Adams admitted that he accidentally caused Officer
Medlin=s death, without any fault attributed to Officer Medlin.

d. Adams=s Friends= Testimony

To bolster the epilepsy
diagnosis, Adams called three friends and an acquaintance to testify on his
behalf.  Only the acquaintance saw Adams,
albeit briefly, on the night of the offense.








Christopher Gregg, a friend
of Adams=s from college, testified that in the past he had seen Adams freeze up
and drop the phone he was using, shake a little bit and seem to space out, and
become incoherent.  He recalled a 2001
incident where, after a night of drinking, Adams Afroze up@ and then
shook ten seconds the next morning.  He
saw this happen more than once.

Eric Prince, another friend
of Adams, testified that he had spoken to Adams on June 11, 2004.  He also testified he had seen Adams consume
alcohol but never saw him get out of control or close to it.

Jason Ware, a detention
officer for the Tarrant County Sheriff=s Department, testified that he was friends with Adams.  He recalled that in high school and junior
high school Adams would sometimes start a sentence and just lose his thought.








Drinking history was the
primary topic.  None of the longtime friends
had ever seen Adams intoxicated.  Adams=s general preference for Hennessy Cognac and Crown Royal on the rocks
was discussed.[6]  Dallas Gentleman=s Club drinks cost between seven and nine dollars after paying a
five-dollar cover charge.  Due to the
cost, only two or three were typically ordered, along with bottles of
water.  However, the friends did not mind
spending money on tipping the dancers and obtaining twenty-dollar lap dances.

Adams visited a second north
Dallas club on the morning of the incident called Carson=s Live Club.  While there, he
ran into a college acquaintance, Anthony Phillips, who saw Adams dancing and
visited with him.  This was around 10 to
12 at night.  Phillips last saw Adams
around 1:00 a.m., and Adams did not look intoxicated, but Phillips admitted he
knew nothing of what Adams drank or ate that night, nor did he know Adams=s alcohol tolerance.

D. Sufficiency Holdings 

The evidence at trial was
conflicting as to whether Adams was intoxicated and as to what caused the
crash.  Although there is evidence that
Adams could have had an absence seizure and that Officer Medlin may have been
standing in an unsafe location, there is also legally and factually sufficient
evidence that Adams was intoxicated to the extent that his ability to drive was
affected.  Thus, there is legally and
factually sufficient evidence that Adams was intoxicated and that his
intoxication caused the crash.  Moreover,
Adams=s evidence to the contrary is not so strong, nor does it outweigh the
State=s legally sufficient evidence that the jury=s verdict is clearly wrong or manifestly unjust.   








Therefore, we hold that under
the applicable standards of review, the evidence to be both legally and
factually sufficient to support the judgment. 
Adams=s first two
issues are overruled.    

IV.  Suppression of the Blood Alcohol Test

In his third issue, Adams
asserts that the trial court erred by failing to suppress the blood alcohol
test administered to him.  We disagree.

A.  Standard of Review

The appropriate standard for
reviewing most trial court=s rulings on a motion to suppress is a bifurcated standard of review,
giving almost total deference to the trial court=s determination of historical facts and reviewing de novo the court=s application of the law.  Maxwell
v. State, 73 S.W.3d 278, 281 (Tex. Crim. App.), cert. denied, 537
U.S. 1051(2002); Carmouche v. State, 10 S.W.3d 323, 327B28 (Tex. Crim. App. 2000); State v. Ross, 32 S.W.3d 853, 856
(Tex. Crim. App. 2000); Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim.
App. 1997).

B.  Application

In Badgett v. State,
42 S.W.3d 136 (Tex. Crim. App. 2001), the court of criminal appeals addressed
the requirements for invoking the mandatory blood specimen provisions of Texas
Transportation Code section 724.012(b). 
Section 724.012(b) states as follows:








A
peace officer shall require the taking of a specimen of the person=s
breath or blood if:

 

(1)
the officer arrests the person for an offense under Chapter 49, Penal Code,
involving the operation of a motor vehicle or a watercraft;

 

(2)
the person was the operator of a motor vehicle or a watercraft involved in an
accident that the officer reasonably believes occurred as a result of the
offense;

 

(3)
at the time of the arrest the officer reasonably believes that a person has
died or will die as a direct result of the accident:

 

(A) any individual has died or will die; or 

(B)
an individual other than the person has suffered serious bodily injury; and 

 

(4)
the person refuses the officer=s request to submit to the
taking of a specimen voluntarily.

 

Tex. Transp. Code Ann. '
724.012(b) (Vernon Supp. 2006).

 

Section 724.013 provides that A[e]xcept as provided by Section 724.012(b), a specimen may not be
taken if a person refuses to submit to the taking of a specimen designated by a
peace officer.@  Id. ' 724.013.    

Badgett emphasized that the officer must reasonably believe that the accident
occurred as a result of the offense, meaning the intoxication.  See Badgett, 42 S.W.3d at 139.  The court said the following:








the plain language of the
statute indicates that the officer=s Areasonable
belief@ that the accident occurred as the result of the offense must be based
on something more than the mere fact of the accident and the officer=s arrest of the defendant for an intoxicated offense.  Therefore, we hold that such a belief must be
based upon specific and articulable facts of causation.

Id.

As articulated by Adams, his
argument in this regard is that Ain the case at bar there is no specific and articulable causation@ and that the observation of red watery eyes and the smell of alcohol
was insufficient to meet the Aarticulable-facts-of-causation@ tests.  We disagree with this
analysis.








First, it is undisputed that
Sergeant Williamson observed that a fellow officer had died as a direct result
of the accident, that Adams had refused to submit to the taking of a blood
sample voluntarily, and that Adams had been arrested pursuant to section 49.04
of the Texas Penal Code.  Sergeant  Williamson was told by Officer Ramsour that
she believed that Adams might be intoxicated but that she had not conducted any
tests at the time she made the statement. 
Officer Ramsour conveyed details to Sergeant Williamson concerning Adams
admissions about drinking and that she had confirmed an alcoholic smell on
Adams.  Adams also admitted to Sergeant
Williamson that he had been drinking earlier. 
Sergeant Williamson also smelled alcohol on Adams=s breath and observed his watery and bloodshot eyes.  Williams suspected Adams was intoxicated
because of his demeanor, the smell of alcohol on him, the appearance of his
eyes, his admission to drinking earlier, and his refusal to submit to field
sobriety tests.  Based on his experience
and training, Sergeant Williamson believed that a person=s ability to drive, including his or her ability to stay on the
roadway and avoid striking people and objects, is affected by alcohol.

Upon hearing all the evidence
at the motion to suppress hearing surrounding the incident, the trial court
ruled that Sergeant Williamson relied on the totality of circumstances at the
scene to authorize a mandatory blood draw. 
We agree and would further point out that in Badgett, the
arresting officer could only say that Badgett probably caused the accident
because he was intoxicated.  Badgett,
42 S.W.3d at 139.  Here Sergeant
Williamson provided specific and articulable facts supporting his reasonable
belief that Adams=s
intoxication caused the crash.  Adams=s third issue is overruled.

V.  Jury Instruction

Adams=s next issue asserts that the trial court erred in denying his request
for a jury instruction under article 38.23 of the Texas Code of Criminal
Procedure regarding the mandatory blood draw.

A.  The Requested Instruction








At the guilt innocence phase
of the trial, Adams requested a charge under Texas Code of Criminal Procedure
Article 38.23(b).  The requested charge
was as follows, tracking the language of section 724.012(b) of the Texas
Transportation Code:

You
are instructed that our law provides that a police officer may only require a
mandatory taking of a specimen of the person=s blood if the following
factors are met:

 

(1)
the officer arrests the person for an offense under Chapter 49, Penal Code,
involving the operation of a motor vehicle or a watercraft;

(2)
the person was the operator of a motor vehicle or a watercraft involved in an
accident that the officer reasonably believes occurred as a result of the
offense;

(3)
at the time of the arrest the officer reasonably believes that a person has
died or will die as a direct result of the accident; and 

(4)
the person refuses the officer=s request to submit to the
taking of a specimen voluntarily.

 

Therefore, if you believe from evidence beyond a
reasonable doubt that the Euless Police Officer

 

(1)
arrested Roy Adams, Jr. for an offense under Chapter 49, Penal Code, involving
the operation of a motor vehicle or a watercraft;

(2)
Roy Adams, Jr. was the operator of a motor vehicle or a watercraft involved in
an accident that the officer reasonably believed occurred as a result of the
offense;

(3)
at the time of the arrest the officer reasonably believed that a person has
died or will die as a direct result of the accident; and

(4)
the person refuses the officer=s request to submit to the
taking of a specimen voluntarily prior to the taking of the blood specimen 

 

then
you may consider evidence, if any, obtained therefrom.

 








However, if you do not believe the above factors
were met beyond a reasonable doubt, or if you have a reasonable doubt as to the
truth of such facts, then you will wholly disregard any evidence obtained as a
result of the blood specimen, and not consider such evidence for any purpose
whatsoever.

 

The trial court refused to
give the jury this charge.

Article 38.23 is the
statutory basis for Adams=s requested
charge to the jury.  That Article states,

No evidence obtained by an
officer or other person in violation of any provision of the Constitution and
laws of the State of Texas, or of the Constitution of laws of the United States
of America, shall be admitted in evidence against the accused on the trial of
any criminal case.        

In any case where the legal evidence raises an
issue hereunder, the jury shall be instructed that if it believes, or has a
reasonable doubt, that the evidence was obtained by violation of the provisions
of this Article, then and in such event, the jury shall disregard any such
evidence so obtained.

 

Tex. Code Crim. Proc.
Ann. art. 38.23 (Vernon 2005).  In Murphy v. State, 640 S.W.2d 297
(Tex. Crim. App. 1982), while discussing Article 38.23, the court stated,

The terms of the statute are mandatory, and when
an issue of fact is raised, a defendant has a statutory right to have the jury
charged accordingly.  The only question
is whether under the facts of a particular case an issue has been raised by the
evidence so as to require a jury instruction.

 








Id. at
299.  Further, in Reynolds v. State,
the court reversed a case for failure to instruct the jury under Article 38.23
as to probable cause.  848 S.W.2d
148, 149 (Tex. Crim. App. 1993) 

B.  Application

An examination of the
evidence before the jury as compared to the statutory requirements of section
724.012 of the Texas Transportation Code, supra, is as follows:

(1)
the officer did arrest Adams pursuant to Chapter 49 of the Texas Penal Code, to
wit, driving while intoxicated,

 

(2)
Adams was the operator of the vehicle involved in the accident, which accident
the officer reasonably believed occurred as a result of the intoxicationCthe
previous enumerated circumstances caused this belief and at the time there was
no evidence before the officer to lead him to believe that Adams had a seizure,

 

(3) a
fellow officer had been killed as a result of the accident, and 

 

(4)
Adams refused the officer=s
request to voluntarily submit to the taking of a specimen.

 








Adams argues that he raised
two fact questions at trial, whether he was intoxicated and whether his
intoxication caused the accident.  The
State does not dispute that Adams hotly contested those issues at trial.  However, there was no evidence disputing
Sergeant Williamson=s authority
to arrest Adams or his reasonable belief that the accident occurred as a result
of Adams=s intoxication.  See Tex. Transp. Code Ann. ' 724.012(b)(1), (2).  Moreover,
both Officer Ramsour and Sergeant Williamson testified to the smell of alcohol
on Adams and other factors reasonably indicating Adams was intoxicated.  

Adams was entitled to an
article 38.23 instruction only if the trial evidence raised a factual issue
concerning whether the evidence was obtained in violation of the federal
constitution or the Texas Constitution or any of its laws.  Bell v. State, 938 S.W.2d 35, 48 (Tex.
Crim. App. 1996), cert. denied, 522 U.S. 827 (1997).  Furthermore, there must be a factual dispute
as to how the evidence was obtained.  Balentine v. State, 71 S.W.3d 763, 773
(Tex. Crim. App. 2002).  However, Adams
does not contend there is any factual dispute as to how the evidence was
obtained.   Only when there is a fact
issue regarding the manner in which the evidence was obtained does
Article 38.23 require the court to submit an instruction to the jury.  Angelo v. State, 977 S.W.2d 169, 178
(Tex. App.CAustin 1998,
pet. ref=d). 

Neither Adams=s claim that he was not intoxicated, nor his claim that his alleged
intoxication did not cause the accident raised a factual dispute as to the
manner in which the complained‑of evidence was obtained.  Therefore, we hold that there was no fact
question warranting the submission of the requested instruction, and we
overrule Adams=s fourth
issue.

 

 








VI.  Cross-Examination

In his fifth issue, Adams
asserts the trial court erred by overruling his objection that the State=s cross-examination question was shifting the burden of proof.  The complained of cross-examination was as
follows,

Q. So you had an opportunity on that videotape to show that you were
fine, to do the field sobriety tests [?] 

 

Mr. Hoover: Your Honor, I=m going to object.  This is an improper shifting of the burden of
proof.  Mr. Adams neither now or [sic] today
has the duty to prove anything.  

 

The Court: Overruled.  

 

Q.
(By Mr. Alpert) You had an opportunity to show in that videotape what your
faculties were like and you refused, right?

 

A. Yes, sir.

 

A. Standard of Review








To preserve error, a party
must continue to object each time the objectionable evidence is offered.  Fuentes v. State, 991 S.W.2d 267, 273
(Tex. Crim. App.), cert. denied, 528 U.S. 1026 (1999); Ethington v.
State, 819 S.W.2d 854, 858B59 (Tex. Crim. App. 1991).  A
trial court=s erroneous
admission of evidence will not require reversal when other such evidence was
received without objection, either before or after the complained‑of
ruling. Leday v. State, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998); Johnson
v. State, 803 S.W.2d 272, 291 (Tex. Crim. App. 1990), cert. denied,
501 U.S. 1259 (1991), overruled on other grounds by Heitman v. State,
815 S.W.2d 681, 690 (Tex. Crim. App. 1991). 
A party must object each time inadmissible evidence is offered or obtain
a running objection.  Valle v. State,
109 S.W.3d 500, 509 (Tex. Crim. App. 2003). 
An error in the admission of evidence is cured where the same evidence
comes in elsewhere without objection.  Id.

B. Application

First, Adams is correct that
an attempt to shift the burden of proof violates due process under the United
States and Texas Constitutions.  See
Francis v. Franklin, 471 U.S. 307, 312B15, 105 S. Ct. 1965, 1970B71 (1985); Brown v. State, 122 S.W.3d 794, 799 (Tex. Crim. App.
2003), cert. denied, 541 U.S. 938 (2004).  However, because Adams failed to preserve any
possible error, we need not determine whether the State=s questioning impermissibly shifted the burden of proof. 

In addition to the above
recited portion of the record, there were multiple occasions, both before and
after Adams=s sole
objection, in which the State elicited testimony regarding Adams=s refusal to perform field sobriety tests. Moreover, the State
repeated the same assertion during closing argument and Adams did not
object.  Therefore, we hold that Adams=s repeated failure to object waived any complaint under this
issue.   

We overrule Adams=s fifth issue.  








VII. Deadly Weapon Finding

In his sixth issue, Adams
claims the trial court improperly made a deadly weapon finding.  Based upon clear prior precedent, we
disagree.   

The indictment alleged that
Adams used a Adeadly
weapon, to-wit a motor vehicle.@  In his brief, Adams admits
that the finding on a motor vehicle as a deadly weapon in an intoxication
manslaughter case has been upheld by the court of criminal appeals.  See Tyra v. State, 897 S.W.2d 796, 798
(Tex. Crim. App. 1995).  Adams also
states that he recognizes we are bound by the court of criminal appeals
precedent, but urges that we consider this issue.  However, we should not frivolously overrule
well-established precedent.  Paulson
v. State, 28 S.W.3d 570, 571 (Tex. Crim. App. 2000).

We therefore hold that the
trial court did not err by making a deadly weapon finding.  We overrule Adams=s sixth issue.  

 

 

 

 

 

 

 








VIII. Retrograde
Extrapolation Testimony

In his seventh issue, Adams
complains that the trial court erred by overruling his objection to retrograde
extrapolation[7]
testimony.  We hold this complaint was
not preserved.       

A. Standard of Review 

To preserve error, a party
must continue to object each time the objectionable evidence is offered.  Fuentes, 991 S.W.2d at 273.  A party must object each time inadmissible
evidence is offered or obtain a running objection.  Valle, 109 S.W.3d at 509.  An error in the admission of evidence is
cured where the same evidence comes in elsewhere without objection.  Id.

B. Application 








Dr. Angela Springfield
testified that a 185 pound male=s BAC while driving would have been higher than Adams=s blood test results after the crash based on facts similar to Adams=s case.  Dr. Springfield was
told to assume that the person stopped driving at 2:30 a.m., had his blood
drawn at 3:30 a.m., had stopped drinking two to three hours before 2:30 a.m.,
and that the person=s blood test
results revealed a 0.11 BAC.  Adams=s counsel stated, AI=m going to
object unless the jury is instructed that this is a hypothetical question.@ In its preceding question the State used the word Ahypothetical,@ not once,
but twice.  Adams was overruled.  Later during Dr. Springfield=s testimony regarding the State=s hypothetical, Adams objected that the question called for
speculation and was again overruled.  Dr.
Springfield went on to testify that she determined that at 2:30 a.m. the person=s BAC would have been higher than the 0.11 level discovered at testing
an hour later.

After hearing these same
hypothetical facts from the State, Dr. Maurice Dennis testified that a person=s BAC would have been higher than 0.11.  Adams did not object.  The State only asked Dr. Dennis about the BAC
of this hypothetical person and did not ask him regarding his opinion of Adams=s BAC at 2:30 a.m. 
However, Adams=s own
counsel questioned Dr. Dennis regarding Adams=s BAC at 2:30 a.m.  Dr. Dennis
testified that based on the pretrial information he was provided that Adams=s BAC was somewhere between 0.12 and 0.13 at 2:30 a.m. on the night of
the incident.








Because the State twice
offered the same hypothetical scenario during testimony and Adams objected in
only one of those instances, we hold Adams failed to preserve any error.  See Valle, 109 S.W.3d at 509; Fuentes,
991 S.W.2d at 273.  However, even if the
admission of this evidence was error, a question that we need not reach, it was
cured because the same evidence came in through Dr. Dennis=s testimony without objection.  Valle,
109 S.W.3d at 509. 

We overrule Adams=s seventh issue. 

IX. Amended Motion for New Trial

In his eighth issue, Adams
argues that the trial court erred by not holding a hearing on his amended
motion for a new trial and allowing it to be overruled by operation of law.

The trial court sentenced
Adams on August 3, 2005.  Adams had
thirty days from this date to file his motion for a new trial.  Tex.
R. App. P. 21.4(a).  He timely
filed this motion on August 30, 2005.  On
September 21, 2005, Adams filed an amended motion for new trial.  Based on Texas Rule of Appellate Procedure
21.4(b), this amended motion was untimely filed.  The amended motion was filed outside of the
allowable period set by the rules and as such failed to vest the court with
jurisdiction over the issue.  See Mercier
v. State, 96 S.W.3d 560, 562 (Tex. App.CFort Worth 2002, pet. struck). 
Since the trial court was without jurisdiction to rule on the amended
motion for new trial, there was no error in refusing to grant the motion.      

We overrule Adams=s eighth issue.

 








X. Laboratory Accreditation

In his ninth issue, Adams
alleges a due process violation based on alleged nondisclosure of exculpatory
evidence.  Specifically, Adams asserts
that the State failed to disclose evidence that at the time of the
testing of Adams=s blood
sample, the medical examiner=s toxicology laboratory did not meet certain standards established by
ASCLD/LAB and the Texas Department of Public Safety.  

A. Standard of Review 

The Due Process Clause of the
Fourteenth Amendment to the United States Constitution is violated when a
prosecutor fails to disclose evidence favorable to the accused that creates a
probability sufficient to undermine confidence in the outcome of the
proceeding.  Thomas v. State, 841
S.W.2d 399, 404 (Tex. Crim. App. 1992). 
In order to establish a due process violation under Brady v. Maryland,[8]
a defendant must show the following:  1)
evidence was suppressed;  2) the
suppressed evidence was favorable to the defense;  and 3) the suppressed evidence was material
to either guilt or punishment.  Id.;
Taylor v. State, 93 S.W.3d 487, 498B99 (Tex. App.CTexarkana
2002, pet. ref=d).  








 The first element of Brady is present
if the prosecution actively suppresses evidence or negligently fails to
disclose it.  Taylor, 93 S.W.3d at
499.  However, the state is not required
to facilitate the compilation of exculpatory material that could have been
compiled by the defense.  Id.  Thus, without suppression, there is no Brady
violation.  Id.  Likewise, there is no Brady
violation if the defendant fails to show that he or she was denied access to
the allegedly favorable material.  Id.
In addition, if the defense has the opportunity to cross‑examine
concerning the allegedly exculpatory material and there is no showing the
defense would have pursued a different trial strategy if he or she had known
this information sooner, no Brady violation is shown.  Id.

B. Application 

The State admits that at the
time Adams=s blood
sample was tested, the toxicology laboratory was not accredited.  However, the evidence showed that such
accreditation was not required when the testing was performed.

The laboratory=s problems were discussed pretrial. 
Adams=s own
attorney specifically inquired about the inspections involved in the
accreditation process and when the laboratory was accredited.  Furthermore, there was trial testimony that
the laboratory=s
deficiencies had been exposed during the accreditation inspections and that the
deficiencies ranged from minor to major. 








Thus, it is obvious that
Adams was aware of the laboratory=s problems both before and after trial.  Moreover, nothing in the record indicates
that Adams=s access to
the laboratory inspection records was somehow limited, nor was Adams=s ability to cross-examine ME office personnel about the inspections
curtailed.  

We hold that there was no
suppression of evidence and overrule Adams=s ninth issue.

XI. Patrol Car Videotape

In his final issue, Adams
contends that the trial court erred by overruling his objection that the
repeated playing of the later enhanced videotape made by Officer Medlin=s patrol car violated Texas Rule of Evidence 403.  Adams claimed that the videotape would be
cumulative, would inflame the jury, and would cause the jury to decide the case
on an emotional basis.  After overruling
his objection, the trial court granted Adams a running objection to the playing
of the videotape.








The State called Grant
Fredericks to testify.  Fredericks is a
forensic video analyst who enhanced the video from Officer Medlin=s patrol car.  During Fredericks=s testimony, the State played the video first without any sound and
then a second time with the image clarified. 
Prior to the second playing, Adams objected pursuant to Texas Rule of
Evidence 403.  The trial court overruled
this objection.  The video was then a
played a third time, this time in slow motion. During this playing, the video
was stopped and started several times for the jury.  The video was then played in continuous loops
ten times.[9]  Fredericks then played the tape zooming in
and out of various scenes. 

A. Admissibility of the
Enhanced Videotape 

1. Standard of Review 

Video recordings in general
may be more helpful to a jury than still photographs.  Gordon v. State, 784 S.W.2d 410, 412
(Tex. Crim. App. 1990). While still photographs offer to the jury an isolated
and fixed content, a video recording allows a more panoramic representation of
the physical and forensic evidence.  Id.
This not to say that any such videotape is per se admissible; a decision must
be made by the trial court after viewing the tape, whether the probative value
of the video is substantial or slight, and in the latter case whether the
proffer is made solely to unfairly prejudice or mislead the jury or confuse the
issues in the case.  See Id.; Tex. R. Evid. 403. 








Furthermore, we review a
trial court=s rulings on
the admission of evidence under an abuse of discretion standard and will not
reverse absent a clear abuse of discretion. 
Apolinar v. State, 155 S.W.3d 184, 186 (Tex. Crim. App.
2005).  If the trial court=s decision to admit the evidence lies within the zone of reasonable
disagreement, then the decision must be upheld.  Rankin v. State, 974 S.W.2d 707, 718 (Tex.
Crim. App. 1998) (op. on reh=g); Montgomery v. State, 810 S.W.2d 372, 391 (Tex. Crim. App.
1991) (op. on reh=g).

2. Application 

We begin by noting that this
is one of those rare instances where the actual crime itself is caught on
videotape.  Counsel has pointed us to no
authority, nor have we uncovered any, that establishes a heightened standard of
review for the admission of an enhanced videotape as opposed to an ordinary
videotape.  Thus, we review the trial
court=s admission of the enhanced videotape under the abuse of discretion
standard.  

Our review of the videotape
reveals that it is highly probative of the fact and manner of Officer Medlin=s death.  See Gordon, 784
S.W.2d at 412.  Thus, it is clearly
relevant under rule of evidence 402.  Tex. R. Evid. 402.  Moreover, the court of criminal appeals has
previously refused to fashion a special rule governing the admissibility of
gruesome pictures merely because they are recorded on videotape instead of
developing paper.  See Gordon, 784
S.W.2d at 413.  








We conclude, after viewing
the videotape in its entirety, that it has substantial probative value and
could have aided the jury in better understanding testimony offered during the
trial.  We further conclude the probative
value of the tape is not substantially outweighed by any prejudicial effect the
video may have had upon the minds of the jurors in the case.  We cannot say the trial court=s decision to admit the video lies outside the zone of reasonable
disagreement, and therefore, we must uphold its decision.  See Rankin, 974 S.W.2d at 718.  Accordingly, we hold that the trial court did
not clearly abuse its discretion by admitting the videotape.  See Apolinar, 155 S.W.3d at
186.  

B. Repeated Playing of the
Enhanced Videotape 

Having concluded that the
enhanced videotape was admissible evidence, we need now address whether its
repeated playing for the jury rises to the level of unfair prejudice under rule
403 or was unnecessarily cumulative and warrants reversal.  In other words, even if the videotape was
properly admissible, was it error to allow it to be replayed repeatedly?  








The court of criminal appeals
has held that a rule 403 analysis may include considerations of:  (1) the probative value of the evidence; (2)
the potential of the evidence to impress the jury in some irrational, but
nevertheless indelible way; (3) the time the proponent needs to develop the
evidence; and (4) the proponent=s need for the evidence.  See
Reese v. State, 33 S.W.3d 238, 240B41 (Tex. Crim. App. 2000).  For
us to overrule the trial court=s Rule 403 analysis, we would have to say that the evidence lay
outside the Azone of
reasonable disagreement.@  Robbins v. State, 88 S.W.3d 256, 260
(Tex. Crim. App. 2002).

Assuming that it was error to
allow the repeated playing of the videotape, a question we do not decide, we
hold that it was harmless error.

1. Harmless Error 

Assuming error, we must
conduct a harm analysis to determine whether the error calls for reversal of
the judgment.  Tex. R. App. P. 44.2. 
If the error is constitutional, we apply rule 44.2(a) and reverse unless
we determine beyond a reasonable doubt that the error did not contribute to
appellant=s conviction
or punishment.  Tex. R. App. P. 44.2(a). 
Otherwise, we apply rule 44.2(b) and disregard the error if it did not
affect appellant=s
substantial rights.  Tex. R. App. P. 44.2(b); see Mosley
v. State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh=g), cert. denied, 526 U.S. 1070 (1999); Coggeshall v. State,
961 S.W.2d 639, 642B43 (Tex.
App.CFort Worth 1998, pet. ref=d).








With respect to the erroneous
admission of evidence, constitutional error is presented only if the correct
ruling was constitutionally required, because a mere misapplication of the
rules of evidence is not constitutional error.  See 
Alford v. State, 22 S.W.3d 669, 673 (Tex. App.BFort Worth 2000, pet. ref=d).  Here, Adams complains of
the trial court=s admission
of the repeated playing of the videotape. 
Adams does not assert any constitutional implications nor do we discern
any from his arguments.  Thus, the
assumed error is not constitutional.  

Because we determine that the
error is not constitutional, Rule 44.2(b) is applicable.  Tex.
R. App. P. 44.2(b).  A substantial
right is affected when the error had a substantial and injurious effect or
influence in determining the jury=s verdict.  King v. State,
953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing Kotteakos v. United
States, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)); Coggeshall,
961 S.W.2d at 643.  In making this
determination, we review the record as a whole.  See Johnson v. State, 967 S.W.2d 410, 417
(Tex. Crim. App. 1998).








In his objections to the
repeated playing of the video, Adams asserted that the State had already
offered into evidence items of physical evidence, photographs, diagrams, and
extensive testimony on the same issues on which the videotape was offered.  As discussed above, there was a great deal of
evidence indicating that Adams was intoxicated and was driving the car that
fatally struck Officer Medlin.  The
enhanced videotape was simply one piece of evidence among many and was no more
incriminating than the other evidence presented at trial.  Furthermore, after Fredericks was questioned
on direct and redirect examination the State again sought to have the videotape
Aloop@ played for
the jury.  Adams again objected and this
time the court sustained his objection.  

Apart from the videotape, the
remaining evidence was more than sufficient to sustain Adams=s conviction.  Thus, we cannot
say that the repeated playing of the tape had a substantial and injurious
effect or influence in determining the jury=s verdict.  King, 953
S.W.2d at 271.  We conclude that, in the
context of the entire case against Adams, the trial court=s assumed error in allowing the repeated playing of the enhanced
videotape did not have a substantial or injurious effect on the jury=s verdict and did not affect Adams=s substantial rights.  See
id.  Thus, we disregard the
error.  See Tex. R. App. P. 44.2(b).

We overrule Adams=s tenth issue.           

 

 

 

 

 

 








XII. Conclusion

Having overruled each of
Adams=s ten issues, we affirm the trial court=s judgment.   

 

 

 

BOB
MCCOY

JUSTICE

 

PANEL B:   LIVINGSTON,
GARDNER, and MCCOY, JJ.

 

DO NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED: February
15, 2007

 

 

    











[1]See Tex.
R. App. P. 47.4.





[2]Detective Peterson is an accident
reconstructionist; he helped launch a collaborative accident reconstruction
team among several mid-cities agencies. 
The group is known as the C.R.A.S.H. team.





[3]When Adams testified, he claimed
that he did not steer his car straight down the exit ramp and, later, that he
could not steer because of the bent wheel.





[4]ASCLD/LAB is a accrediting body for
crime laboratories.  Through
accreditation a laboratory can demonstrate that its management, personnel,
operational and technical procedures, equipment and physical facilities meet established
standards.  See ASCLD-LAB.org,
About ASCLD/LAB, http://www.ascld‑lab.org/dual/aslabdualaboutascldlab.html
(last visited Feb. 6, 2007).    





[5]The evidence also included a brief discussion
of potential photosensitivity and the strobe-like effect that windshield wipers
and lights might precipitate. While only one percent of the population has
epliespy, photosensitivity is even more uncommon and only occurs in three to
five percent of those who have epilepsy. 
Dr. Leroy believed it unlikely that Officer Medlin=s emergency lights induced a
seizure, and Adams=s two photic stimulation tests had
negative results.





[6]Adams=s key chain found at the crash
sported an AS.S. Hennessy@ logo.





[7]Retrograde extrapolation is the
computation back in time of a person=s blood‑alcohol level.  Mata v. State, 46 S.W.3d 902, 908B09 (Tex. Crim. App. 2001).  In a DWI case, it is used to determine the
blood‑alcohol level at the time of driving based on test results obtained
at a later time.  Id.

 

 





[8] 373
U.S. 83, 83 S. Ct. 1194 (1963).  





[9]Adams asked the trial court to have
the record reflect that the video was a continuous loop played ten times.  The trial court ordered that the record would
so reflect.